CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
August 08, 2024
LAURA A. AUSTIN, CLERK
BY: s/ S. Neily, Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOSHUA L.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:23-cv-470 |
| | ) | |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY,[2] | ) | By: C. Kailani Memmer |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Joshua L. ("Joshua") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Joshua alleges the Administrative Law Judge ("ALJ") Joseph Scruton erred in his assessment of Joshua's (1) physical impairments and RFC findings and (2) subjective allegations.

This case is before me on referral under 28 U.S.C. § 636(b)(1)(B). *See* ECF No. 9. I now submit the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision. Having considered the administrative record, the parties' filings, and the applicable law, and for the reasons set forth below, I respectfully

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in Social Security opinions.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

recommend the presiding District Judge **AFFIRM** the Commissioner's final decision and

**DISMISS** this case from the Court's active docket.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to

support the Commissioner's conclusion that Joshua failed to demonstrate he was disabled under

the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it

consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and

alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing

that the standard for substantial evidence "is not high"). While substantial evidence is somewhat

deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings." *Lewis v.

Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the

[Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589).

Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its]

duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate his findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

Joshua filed for DIB on April 30, 2021, alleging disability beginning on March 7, 2021. R. 28. Joshua's claims were denied by the Commissioner at the initial and reconsideration levels of administrative review on September 28, 2021, and November 9, 2021, respectively. R. 28. On June 9, 2022, the ALJ conducted a telephone hearing. R. 28. Brandon Kortgard, a non-attorney representative, represented Joshua at the hearing. R. 28. The ALJ denied Joshua's claims on August 29, 2022, using the familiar five-step process[4] to evaluate his request for benefits. R. 41–42.

At step one, the ALJ found that Joshua had not engaged in substantial gainful activity since March 7, 2021, the alleged onset date. R. 31. At step two, the ALJ determined Joshua has

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 n.1 (4th Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimants age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

the following severe impairments: urethral strictures, residual effects of left great toe injury with left foot hallux rigidus, recurrent kidney stones, gout, and obesity. R. 31. At step three, the ALJ concluded Joshua does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. *Id*. The ALJ concluded Joshua has the residual function capacity ("RFC"):

> to perform sedentary work. However, he can never crawl or climb, use foot controls, should not work around hazards like machinery or heights. Additionally, Joshua will require brief bathroom breaks of a few minutes, occurring up to once per hour; and due to pain/discomfort producing distraction, may fall off task less than 10% total of the workday, apart from regularly scheduled break periods.

R. 32.  At the fourth step, the ALJ determined that Joshua could not perform any past relevant work as a construction framer, furniture shipping loader, or hotel groundskeeper. R. 40. At the fifth step, the ALJ found that Joshua could perform jobs that exist in significant numbers in the national economy, such as document preparer, final assembler, and sorter. R. 41. Thus, the ALJ concluded a finding of "not disabled" for Joshua was appropriate. R. 41. This appeal followed.

## FACTS

### I.  Medical History Overview

On April 11, 2006. Joshua presented to Dr. Matthew Kaatz at New River Medical Group with right knee pain and swelling which started after he fell off his skateboard and landed on his right knee. R. 580. Joshua had swelling, abrasion, difficulty with movement, and stiffness. *Id*. On examination Joshua was sitting uncomfortably. *Id*. Joshua's right knee had a suprapatellar effusion with abrasion anteriorly, some swelling, and decreased range of motion (ROM). *Id*. Consequently, the treatment plan for Joshua's right knee sprain included the use of crutches, instructions for Joshua to stay off his knee, and an ibuprofen regimen. *Id*.

On April 18, 2006, Joshua presented at New River Medical Group for a follow-up of his right knee contusion with sprain. R. 579. Dr. Kaatz reported that the swelling in Joshua's knee improved with increased ROM and almost normal gait and transitioning. *Id*. However, certain maneuvers were still painful for Joshua, especially with extension against resistance, although it was noted he had no active issues. *Id*. Assessment revealed the knee contusion was healing well. *Id*.

On April 23, 2007, Joshua presented to New River Medical Group with left medial foot pain that occurred while he was skateboarding. R. 577.  After a failed attempt at flipping the skateboard, Joshua landed on its side causing his left ankle to roll inward. *Id*. Joshua felt a pop and experienced a pain and tenderness. *Id*. Two-and-a-half years prior to this incident, Joshua fractured the left ankle above the growth point which purportedly healed nicely without any residual complaint. *Id*.  Per the assessment conducted by Dr. Kaatz, Joshua sprained his left ankle and was instructed to ice it and take ibuprofen.  *Id*.

On August 17, 2011, Joshua presented to New River Medical Group with complaints of intermittent back pain. R. 574. Physical examination by Dr. Kaatz revealed Joshua was sitting comfortably and making good eye contact. *Id*. However, Joshua was having a hard time urinating. *Id*. Dr. Kaatz's assessment was candida balantis for which he prescribed Rocephin, doxycycline, and Diflucan. *Id*.

On June 15, 2015, Joshua presented to Lewis Gale Hospital - Pulaski with complaints of blood in his urine in addition to left flank pain. R. 325. Additionally, Joshua reported there were bits of hard material passing in his urine. *Id*. A CT scan of Joshua's abdomen and pelvis revealed moderate left sided hydronephrosis secondary to a 4 mm stone in the distal left ureter at the level

of the acetabulum. R. 328. Consequently, Joshua was prescribed Percocet and Zofran and instructed to drink plenty of fluids. R. 329.

On June 16, 2015, Joshua appeared at Lewis Gale Hospital - Pulaski emergency room with the complaints of blood in his urine and feces and intense back pain. R. 331. Joshua presented with signs and symptoms of abnormal urination and lower back pain. R. 334. His urine appeared blood tinged. *Id*. CT scans of the abdomen and pelvis revealed moderate left-side hydronephrosis secondary to a 4 mm stone in the distal left ureter at the level of the acetabulum. R. 636. Joshua was discharged the next day and instructed to drink plenty of fluids and avoid soda. R. 339.

On July 4, 2015, Joshua presented to the emergency room at Lewis Gale Hospital – Pulaski with complaints of abdominal pain, blood in his urine, and flank pain within his lower abdomen. R. 380. Joshua remarked he had not passed the kidney stone that was bothering him during his last visit, and his pain had persisted over two weeks. *Id*. A CT scan of Joshua's abdomen revealed that the distal left ureteral calculus seen on June 16, 2015, was no longer present. R. 414. In general, the scan came back negative. *Id*. Joshua reported that he was feeling better, and he was also able to urinate while at the emergency room. R. 384. Joshua was prescribed Cipro, Pyridium, and Flomax before he was discharged. R. 385.

On July 6, 2015, Joshua presented at Lewis Gale Hospital – Pulaski emergency room with signs and symptoms of abnormal urination, lower back pain, nausea, and lower abdominal pain. R. 389. Joshua's urine appeared concentrated. *Id*. Additionally, Joshua had complaints of blood in his urine and dysuria in both flanks, suprapubic, and a diffuse abdomen. R. 433. Joshua reported having trouble urinating and had attempted to self-catheterize four times with largely just blood being produced and very little urine the previous night. *Id*. The primary impression at

6

issue on this visit was urinary retention. R. 435. An operation was performed revealing a stone

that had been lodged at his sphincteric mechanism. R. 431. The stone was ultimately removed in

addition to a small clot from his bladder. *Id*. During the operation, a catheter was placed with the

expectation that he would use it for a week. *Id*.

On July 7, 2015, Joshua presented at Lewis Gale Hospital with complaints of the inability

to void. R. 711. Joshua reported that, "I have been hurting for a couple of weeks now, I had a

kidney stone and I passed it, and then I came here yesterday, and the doctor said I had a UTI. I

still can't void." *Id*.  During this visit, Joshua's presenting signs and symptoms included fever,

abnormal urination, and lower back pain. R. 714. Joshua's urine appeared orange. *Id*.

On July 14, 2015, Joshua presented to Dr. Schmidt with the chief complaint of urethral

stones and incomplete emptying. R. 766. Dr. Schmidt performed a bladder irrigation. R. 767. Dr.

Schmidt's assessment revealed urinary retention with a urethral stone lodged at the sphincter. *Id*.

On October 22, 2015, Joshua presented to Dr. Schmidt for a follow up visit concerning

urinary retention. R. 764. Joshua reported no complaints, stating that his control was excellent

and that his stream was strong. *Id*. For treatment, Dr. Schmidt recommended that Joshua drink at

least 48–64 ounces of water a day, in addition to significantly decreasing his soda consumption.

R. 765.

On April 1, 2016, Joshua presented at New River Medical Group - Pulaski for an

evaluation of his great toe pain. R. 571. While at work, a large log fell on Joshua's foot. *Id*. Dr.

Kaatz reported Joshua was experiencing a lot of pain and a forward sloping angulation of the

great toe over the proximal phalanx where there was some ecchymosis, tenderness, and minimal

swelling. *Id*. Dr. Kaatz reported that Joshua had some dysuria, nocturia, urgency, the need to get

up around four times at night, dribbling, and kidney stones. *Id*. Joshua reported he has been

favoring the left foot and now has pain in the right knee, which he previously injured in a skateboarding accident. *Id*. Dr. Kaatz's physical examination revealed that Joshua was sitting comfortably and had antalgic gait. *Id*.  Dr. Kaatz's assessment revealed Joshua probably had a first digit left foot fracture. *Id*.

On April 25, 2016, at New River Medical Group, Joshua presented for a follow up of left great toe pain status post-injury. R. 569. Dr. Kaatz recommended an x-ray for deformity, which Joshua did not obtain. *Id*. Additionally, Joshua did not follow up with an orthopedic specialist as directed. *Id*. Dr. Kaatz noted that Joshua was still "gimping" around and now was having pain in the ankle at the site of previous fracture from his posturing to protect the area. *Id*. Additionally, Joshua reported experiencing problems with urinary outlet obstruction with difficulty starting his urine stream. *Id*.  Dr. Kaatz's physical exam revealed Joshua's toe to be slightly bruised. *Id*. Joshua reported he had been noticing some clicking when walking in his great toe shaft. *Id*. Dr. Kaatz's assessment concluded Joshua was experiencing persistent left great toe pain and urinary hesitancy. *Id*. Dr. Kaatz told Joshua to get an x-ray for his great toe pain. *Id*.  Regarding the urinary hesitancy, Dr. Kaatz believed that Joshua might have some prostrate hypertrophy causing obstruction, meaning that it might be inflamed from the recent instrumentation and procedure. *Id*.

On April 29, 2016, exams taken at Lewis Gale Hospital at Pulaski of Joshua's left foot revealed no fracture, dislocation or acute abnormality. R. 590.

On May 3, 2016, at New River Medical Group, Joshua followed up with Dr. Kaatz regarding his left foot/big toe. R. 570. Dr. Kaatz noted the negative results of the x-ray taken at Lewis Gale. Due to the persistent clicking sound in Joshua's toe when he walked, Dr. Kaatz was concerned about the possibility of a missed fracture and referred Joshua for an orthopedic evaluation. *Id*.

On July 8, 2016, Joshua presented to Lewis Gale for an x-ray of his abdomen to evaluate the presence of a kidney stone. R. 770. Dr. Schmidt found no small bowel dilation nor any convincing calcifications present. *Id*.

On July 20, 2016, at New River Medical Group, Joshua presented for a follow up of a history of recurrent urolithiasis that flared in the last couple of days. R. 568. Joshua reported experiencing urinary hesitancy, dysuria, nocturia, urgency, nausea, and dribbling. *Id*. Red and white blood cells were discovered inside of Joshua's urine sample. *Id*. Dr. Kaatz's physical examination revealed Joshua was sitting uncomfortably, hunched over, and guarding the right side with pain radiating into the right flank and right lower quadrant. *Id*. Dr. Kaatz's assessment revealed urolithiasis for which he proscribed Zofran and Norco. *Id*.

On July 20, 2016, Michael R. Aronson, M.D., performed a sonographic survey of Joshua's kidneys and bladder. R. 785. During observations with color Doppler, no ureteral jets were seen. *Id*. Additionally, both kidneys appeared normal in appearance. *Id*. Joshua's bladder was well distended and normal in contour. *Id*.

On August 3, 2016, at New River Medical Group, Joshua presented for follow up of a history of recurrent urolithiasis. R. 566.  Symptoms reported include persistent nausea, chills, generalized weakness, fatigue, decreased intake, and excessive thirst. *Id*.  Joshua reported experiencing abdominal discomfort and flank pain. *Id*.  Dr. Kaatz's assessment revealed urolithiasis of the kidney and ureter in addition to a urinary tract infection. *Id*.  A physical examination revealed Joshua was hunched over and had a hard time sitting still. *Id*.

On August 8, 2016, Joshua presented to Dr. Schmidt with complaints of a diminished stream over the past two to three months. R. 761. Joshua stated he sometimes must strain to void, but then he will get a steady stream. *Id*. Joshua also shared complaints of bilateral back pain. *Id*.

Dr. Schmidt reported Joshua had no trauma to his urethra by a Foley catheter inserted in the emergency room. *Id*. Because of Joshua's kidney stone, the catheter was not able to advance. *Id*. Dr. Schmidt did not find Joshua to be in urinary retention based on the CT scan. R. 762. Additionally, Dr. Schmidt did not find Joshua's back pain to be related to his kidney stones. *Id*. Joshua agreed to the retrograde urethrogram Dr. Schmidt recommended for treatment. *Id*.

On August 9, 2016, at New River Medical Group, Joshua presented for a follow up of his recurrent urolithiasis. R. 567. He reported experiencing persistent nausea and pain in addition to head congestion, runny nose, and cough. *Id*. Additionally, Joshua had polyuria, hesitancy, dysuria, nocturia, urgency, dribbling, and a history of kidney stones. *Id*. A physical exam revealed Joshua was hunched over, seemingly in pain. *Id*. Dr. Kaatz's assessment revealed Joshua was experiencing urolithiasis with persistent pain. *Id*.

On August 23, 2016, Joshua again returned to Dr. Schmidt complaining about persistent issues in alignment with urethral stricture disease. R. 759. Dr. Schmidt asked Joshua to consider cystoscopy to assess where and if he has a stricture and Joshua agreed. *Id*. After performing the cystoscopy, Dr. Schmidt confirmed that Joshua had a stricture at his sphincteric mechanism, which appeared to be very small. R. 760. Dr. Schmidt noted he was not able to get past it with a scope. *Id*. Dr. Schmidt recommended surgery for dilation of the stricture. *Id*.

On September 6, 2016, Dr. Mark Schmidt's preoperative and postoperative diagnosis for Joshua was urethral stricture. R. 751. The procedures performed were a cystoscopy with an internal urethrotomy, and urethral catheter placement. *Id*. Procedurally, Joshua's urethra was noted to be normal apart from the bulbar urethra. *Id*. Looking beyond, Dr. Schmidt noticed concentric small strictures leading to the sphincter. *Id*. Dr. Schmidt proceeded to incise the majority stricture, followed by the placement of a guidewire. *Id*. Additionally, Dr. Schmidt

reinserted the urethrotome and made a small incision at the most proximal bulbar stricture, allowing the urethra to open. *Id.* Dr. Schmidt left a wire in place and then passed a catheter. *Id.*

On December 28, 2016, Joshua saw Dr. Schmidt, presenting with a urethral stricture and complaints of frequent urination, painful urination, and urinary urgency. R. 755. Dr. Schmidt did an internal urethrotomy on Joshua. *Id.* Joshua reported that his stream was strong and that he had good control. *Id.* Additionally, Joshua presented with rare nocturia. *Id.*

On July 24, 2020, Joshua presented at Jefferson Surgical Clinic with voiding issues stemming from his hydration status. R. 275. Mark A. Schmidt, M.D. (the same physician who treated him previously) noted that if Joshua is sufficiently hydrated, he does well. *Id.* While Joshua has nocturia two to three times, he feels that he empties his bladder well. *Id.* Additionally, Joshua shared he occasionally gets urinary tract infections, has known kidney stones, and will have pain particularly on his right side sometimes. *Id.* Joshua reported he experiences frequent urination, urinary incontinence, and urinary urgency. R. 276. Dr. Schmidt's treatment plan for Joshua indicates:

> Presently [Joshua has] done fairly well and his symptoms have been stable for at least 4 years. His urine specimen is unremarkable and his postvoid residual stable. I do not see that he necessarily needs to consider any type of intervention. I do think that if things should get worse he needs to get a formal retrograde urethrogram, but I would recommend that being done at the University with consideration for potential definitive repair. I did explain if he gets to where he cannot void in the future to never let anyone try to put a catheter in him I would get a suprapubic tube placed temporarily. I think he needs to consider definitive repair in the future possibly because obviously with internal urethrotomy the chance of recurrence of his stricture is quite high. He is in agreement to that but he wants to sit presently since he has done fairly well. He will keep me posted of his progress.

R. 277.

On December 21, 2021, Joshua presented to Carilion Clinic Family Medicine as a new patient, "trying to get disability." R. 930. Matthew Jones' assessment of Joshua revealed renal

11

calculi, postprocedural urethral stricture, left great toe pain, history of fracture of the left ankle,
and chronic right-sided low back pain. R. 933. Joshua's treatment plan during this visit included
a referral to physical therapy to evaluate and treat his chronic back pain. R. 931.

On February 9, 2022, Joshua was seen at OrthoVirginia by Bart Eastwood, D.O., with
complaints of left foot pain, in addition to pain of the left lower leg. R. 910. Impression revealed
great toe pain with possible concern for hallux rigidus or cartilage damage to the
metatarsophalangeal ("MPT") joint. *Id*. An MRI of the left foot was ordered to further evaluate
the cartilage. *Id*. An in-office x-ray of the left lower leg revealed normal knee and ankle joint
space, normal alignment, normal bony architecture, no effusion, and no significant soft tissue
swelling. R. 911. X-rays of the left foot revealed normal joint space, normal alignment, normal
bony architecture, no evidence of fracture or dislocation, and no significant soft tissue swelling
or effusion. *Id*.

On March 31, 2022, Joshua was seen at Wythe County Community Hospital for an MRI
examination of his left foot. R. 895. The exam revealed normal cortex, marrow signal, and no
periarticular erosions. *Id*. The MRI results included mild degenerative change at the great toe
metatarsophalangeal joint, minimal early spurring at the head of the metatarsal, and no effusions.
*Id*. Impressions include no acute bony derangement, mild early arthrosis at the big toe MTP joint,
no acute muscle or tendon injury, and no lenosynovial inflammatory change. *Id*.

On April 8, 2022, Joshua followed-up at the Carilion Clinic Family Medicine for ongoing
left foot pain. R. 926. Joshua reported he was unable to tolerate secondary pain in the left foot, in
addition to a popping sensation over the left lower leg. *Id*. Joshua also reported burning and
stinging pains in both lower extremities up to his knees which tended to occur at night. *Id*.
Joshua shared there are times when he cannot tolerate a sheet over his left great toe. *Id*.

On April 14, 2022, Joshua presented at the Carilion Clinic of Family Medicine for a discussion of ongoing left foot pain. R. 923. Joshua complained of ongoing burning and stinging in both lower extremities up to his knees which is present usually at night. *Id*. Further, Joshua's uric acid was minimally elevated on recent labs which were reviewed with him on this visit. *Id*. Joshua was recommended allopurinol for gout treatment, which he refused. *Id*. Joshua's diagnosis included chronic left foot pain and paresthesia. *Id*.

On July 1, 2022, Joshua presented to Dr. Schmidt for a follow-up. R. 936. Joshua shared that he had passed several stones recently, and while he was experiencing urinary urgency, he was not experiencing incontinence. *Id*. Further, Joshua reported that as long as he stays hydrated, he does well. *Id*. Joshua feels that he empties well at night one to two times. *Id*. Services performed include a bladder ultrasound which revealed no complications. R. 937. Assessment revealed a urethral stricture, calculus of kidney and a body mass index of 31. R. 938. Dr. Schmidt conceded he was concerned with the stone passage because if Joshua was to get a large stone, he might have difficulty getting it past his stricture. *Id*.

On July 7, 2022, Joshua presented to Dr. Schmidt for a follow-up visit. R. 936. Dr. Schmidt conducted a bladder ultrasound and urine analysis which revealed no complications. R. 937. Joshua's assessment revealed a urethral stricture and calculus of the kidney. R. 938. Dr. Schmidt's treatment plan focused on the passage of stones because a sizeable stone would have difficulty getting past Joshua's stricture. *Id*. Dr. Schmidt recommended a CT scan for further evaluation of the kidneys. *Id*. Dr. Schmidt told Joshua to consider a urethroplasty and further studies at the University of Virginia. *Id*.

## II. Opinion Evidence

On August 27, 2021, Joshua presented to the Virginia Department of Rehabilitative
Service for an independent examination by nurse practitioner, Haley Lowman. R. 311. Joshua's
chief complaints included urethral injury, chronic kidney stones, diminished ability to urinate,
painful urination, chronic fatigue, chronic broken great toe, peripheral neuropathy, growth plate
injury to the left ankle, and chronic pain. *Id*. Ms. Lowman reported Joshua's general appearance
showed no acute distress, noting that he could rise from the waiting room chair independently,
sat comfortably during the examination, and was able to take off his shoes and socks with no
assistance. R. 312–13. Further, Ms. Lowman reported Joshua's mental status to be alert and
oriented, evidenced by his normal conversational speech and logical thought processes. R. 313.
Concerning activities of daily living, the exam revealed Joshua can bathe, dress, eat, cook, and
clean his surroundings. *Id*. Joshua reported experiencing fatigue, weakness, urinary urgency,
back pain, joint swelling, joint stiffness, and headaches. R. 312. Joshua provided a good faith
effort and there were no inconsistencies in the information he provided. R. 315. Concerning gait,
Ms. Lowman noted Joshua was not able to walk on the toes of his left foot. R. 313. However,
Joshua was able to walk on his heels and did not walk with an assistive device. *Id*. General
findings of Ms. Lowman's independent examination revealed Joshua has demonstrated a level of
functional impairment. *Id*.

Ms. Lowman indicated the level of impairment, if present, was none. *Id*. Joshua had full
ROM and strength; however, he did require the ability to go to the restroom on an as needed
basis. *Id*. Ms. Lowman's functional assessment concluded Joshua can do the following work-
related activities: frequently lift and carry up 20 pounds; occasionally lift and carry up to 100
pounds; stand for about 6 hours in an 8-hour workday; walk for about 6 hours in an 8-hour

workday; frequently reach, handle, feel, and grasp; occasionally bend; and frequently stoop,

kneel, and squat. R. 316. Ms. Lowman diagnosed Joshua with lumbago, urinary urgency, and a

history of kidney stones. R. 315.

On September 28, 2021, Jack Hutcheson, Jr., M.D., indicated in a "Disability

Determination Explanation" that the evidence provided was consistent with a "non-severe"

determination. R. 80. Concerning disorders of the skeletal spine and chronic kidney disease, Dr.

Hutcheson concluded these impairments are non-severe. *Id*. While Dr. Hutcheson conceded one

or more of Joshua's medically determinable impairments reasonably can be expected to produce

pain, he also found inconsistencies between Joshua's statements regarding his symptoms and the

total medical and non-medical evidence in the file. *Id*. Dr. Hutcheson found Joshua's statements

are not substantiated by the objective medical evidence alone. *Id*. Dr. Hutcheson noted while

Joshua reports pain associated with injury to his left foot, imaging shows no evidence of fracture

or abnormality, and examination shows no limitation to ROM or gait. Further, Dr. Hutcheson

noted Joshua reports neuropathy, but the examination revealed no signs of neuropathy. *Id*.

On November 7, 2021, Joshua saw Dr. Daniel Camden, M.D., a medical consultant with

Disability Determination Service, who noted there is no treatment evidence to show that Joshua's

weak urinary stream, back pain and foot/ankle injury remain severe. R. 86. Regarding the back

pain and foot injury, Dr. Camden reported there is little evidence to support Joshua's claims. *Id*.

Dr. Camden found that Joshua's physical consultive exam and x-rays were normal. *Id*.

Concerning Joshua's back and left foot, Dr. Camden affirmed that the non-severe determination

remains appropriate. *Id*. Regarding Joshua's urinary problems, Dr. Camden found that without

treatment, there was no way to show this condition is severely impairing, and therefore, the non-

severe determination remained appropriate. *Id*.

<u>ANALYSIS</u>

Joshua alleges that the Administrative Law Judge ("ALJ") erred in his assessment of his physical impairments, RFC finding, and subjective allegations, claiming the ALJ's assessments are not supported by substantial evidence.

### I.  The ALJ's Assessment of Joshua's Impairments and RFC Findings

Joshua argues that the ALJ's conclusion that he can perform a range of sedentary work with appropriate non-exertional limitations is not supported by substantial evidence.  In support of his argument, Joshua claims that the ALJ failed to conduct a function-by-function analysis. After considering the testimony of the vocational expert, Diamond Warren, the ALJ determined Joshua can make a successful transition to other work that exists in large quantities within the national economy. R. 41. As a result, the ALJ determined that a finding of not disabled is appropriate. *Id*.

An ALJ's RFC findings must be supported by substantial evidence within the record. *Hall v. O'Malley*, No. 2:22-CV-54, 2024 U.S. Dist. LEXIS 54135, at *7 (E.D.N.C. Mar. 25, 2024). Further, the ALJ has a duty to develop the record before determining the claimant is not disabled. *See* C.F.R. § 404.1545(a)(3). A vocational expert considered Joshua's age, education, work experience, and RFC and testified that Joshua would be able to perform the requirements of the following representative occupations: Document Preparer, Final Assembler, and Sorter. R. 41

In *Mascio v. Colvin*, the Fourth Circuit rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that " '[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where

other inadequacies in the ALJ's analysis frustrate meaningful review.'" *Mascio*, 780 F.3d at 636

(citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

After consideration of Joshua's various genitourinary problems, the ALJ concluded that

Joshua is limited to performing a range of sedentary work with reduced postural and

environmental requirements with allowance for some off-task behavior. R. 37–38. To support his

finding, the ALJ took into account specific medical evidence within the record including

claimant's longstanding issues of recurring kidney stones, ureteral stones, urinary tract infections

occurring since well before he stopped working, his diagnoses of urethral trauma and retention in

July 2015, procedures including cystoscopy with internal urethrotomy, urethral dilation, urethral

catheter placements in September 2016, a diagnosis of urethral stricture in 2020, and concerns

from his urologist regarding passing sizable stones in July 2022. R. 35. Overall, there is

substantial evidence in the record to support the ALJ's conclusion that Joshua can perform a

range of sedentary work with appropriate non-exertional limitations. *Id*.

Furthermore, the ALJ considered the opinions based on the consultative examination on

August 2021 to be partially persuasive. R. 39. Hailey Lowman, the examiner, found that Joshua

could lift and carry up to 100 pounds occasionally, and 20 pounds frequently; sit for about eight

hours; stand for about six hours; walk for about six hours in an eight-hour workday; frequently

perform manipulative activities; occasionally bend; and frequently stoop, kneel, and squat. *Id*.

The ALJ found Ms. Lowman's opinion to be partially persuasive because it is not entirely

consistent with other evidence, including Joshua's subsequent reports of extremity issues to his

own providers. *Id*. The ALJ found that Joshua had greater postural and exertional limits than Ms.

Lowman identified and would require some time off-tasks due to pain. *Id*. Ultimately, the

medical opinions support the ALJ's assessment of Joshua's impairments and RFC findings.

## II.  The ALJ's Assessment of Joshua's Allegations is Supported by Substantial Evidence

Joshua argues the ALJ failed to build a logical bridge between the evidence and his findings regarding Joshua's subjective allegations. Additionally, Joshua asserts that the evaluation of his allegations consisted of conclusory statements regarding his functional capacity and that the ALJ failed to provide an explanation for his conclusions. Joshua further asserts the ALJ improperly discredited his statements about the severity, persistence, and limiting effects of his symptoms because the ALJ did not find them to be consistent with the objective evidence. Joshua's assessments are incorrect, as the ALJ considered the medical evidence of the record in conjunction with Joshua's subjective allegations. The ALJ analyzed Joshua's daily activities, as well as his allegations of his symptoms and came to a well-founded conclusion that Joshua's daily activities suggest less functional loss than generally alleged. R. 35–36.

An ALJ must assess a claimant's subjective complaints about the extent of their functional limitations by considering the objective medical evidence and other factors, including treatment history, medications, work history, and daily activities. 20 C.F.R. §§ 404.1529(c), 416.929(c). An ALJ must engage in a two-step process in which he first determines whether there is an underlying medically determinable mental or physical impairment that could reasonably be expected to produce the claimant's pain or other symptoms. Secondly, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). In making this determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the

18

individual's case record." *Id*. An ALJ's assessment of the credibility of a claimant's subjective complaints are afforded a high level of deference on review, as the Fourth Circuit has proclaimed such assessments are "virtually unreviewable" on appeal. *Darvishian v. Geren*, 404 F. App'x 822, 831 (4th Cir. 2010). Per CFR 404.1520c(d), the ALJ is not required to articulate how he considers or evaluates evidence in the record from nonmedical sources.

Concerning Joshua's genitourinary allegations, in August 2021, Joshua claimed during a consultative examination that he was experiencing ongoing urinary symptoms, but they were not so severe that they would have required him to wear adult diapers. R. 36. Further, Joshua reported daytime voiding intervals of every 2-3 hours, in contrast to his hearing testimony where he said he got up five times at night to void. *Id*. According to a urology note from July 2022, Joshua stated, "as long as he stays hydrated, he does fairly well. He feels that he empties fairly well with nocturia 1-2 times. There is urgency but no incontinence." *Id.* Joshua's urinalysis at that visit showed negative findings. *Id*. Joshua's assertion that the ALJ ignored that he requires the ability to use the restroom as needed on an emergency basis throughout the day is defeated by the ALJ's RFC finding that Joshua be allowed to have extra bathroom breaks and off-task behavior. R. 36.

The ALJ found the medical evidence of record is generally not consistent with the depiction that plaintiff's genitourinary issues are of such intensity, persistence, and limiting effects as they might rule out even sedentary work. R. 36.  To reach this finding, the ALJ cites a July 2020 ultrasound in which the Joshua's bladder showed no complications. *Id*. Further, during that visit, Joshua's urologist noted that Joshua had, "done fairly well" and that his symptoms had been stable for at least four years. *Id*. Although Joshua's urologist discussed with the claimant the possibility of future evaluations and surgery at the University of Virginia, Joshua did not pursue

these options. *Id*. In fact, Joshua's urologist noted that he wanted to, "sit tight presently, since he has done fairly well." *Id*.

The ALJ acknowledges that Joshua cannot return to his past work in construction. Implicit in this recognition is the notion that Joshua has physical limitations that prevent him from doing such work. In conjunction with these findings, the medical records show that in August 2021, Joshua had a non-antalgic gait and intact standing ability. R. 38. Joshua was also able to rise from his waiting room chair independently and take off his shoes and socks without assistance. *Id*. The medical records show that Josh can walk on his heels and perform tandem gait, he has full range of motion and strength, and his spine had normal curvature and no paraspinal muscle tenderness. *Id*. Additionally, a straight leg test returned negative bilateral results, and x-rays of Joshua's left foot and ankle showed no acute findings. *Id*. In December 2021, Joshua's muscle strength was graded 5/5 in all extremities. *Id*.

The ALJ concluded Joshua's lower extremity allegations are partially consistent with other evidence. R. 36. Further, the ALJ notes that Joshua's chronic lower extremity symptoms have been managed in a relatively conservative fashion. R. 38. When Joshua's primary care provider suggested he try a gout medication, Joshua declined. *Id*. Joshua's orthopedist did not see the need for him to consult with a neurologist. *Id*. In February 2022, a physical examination showed decreased range of motion in the claimant's left ankle and left great toe and tenderness over his left tibia and left MTP joint, although x-ray studies of the claimant's left lower extremity showed normal findings. *Id*. In March 2022, an MRI of the claimant's foot showed mild early arthrosis at the great toe MTP joint, though no acute bony derangement. R. 37. In April 2022, examination of the claimant's left foot showed that he was 'super sensitive' over the first MTP joint, painful dorsiflexion and bending fore pain of the left great toe**.** R. 37.

Joshua cites the *Arakas* case in which the ALJ improperly discredited the plaintiff's statements about the severity, persistence, and limiting effects of his symptoms due to inconsistencies with the objective evidence. In *Arakas*, the court found the claimant was entitled to rely entirely on subjective evidence because of the severity of the symptoms that prevented her from working a full day. In this case, the ALJ notes that Joshua did not receive treatment for worsening lower extremity problems around the time he stopped working. R. 37. Since the record does not illustrate a substantial worsening of these issues around the alleged onset date, the ALJ properly concluded Joshua can perform a range of sedentary work. *Id*.

Ultimately, the ALJ considered Joshua's allegations concerning his symptoms of genitourinary and lower extremity issues and the resulting limitations borne out of these conditions. A reviewing court gives great weight to the ALJ's assessment of a claimant's statements and should not interfere with that assessment where the evidence in the record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989–90 (4th Cir. 1984). Accordingly, the ALJ supported his analysis of Joshua's subjective complaints with substantial evidence.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the presiding District Judge **AFFIRM** the Commissioner's final decision and **DISMISS** this case from the Court's active docket.

## NOTICE TO PARTIES

The Clerk is directed to transmit the record in this case to the presiding District Judge and to provide copies of this Report and Recommendation to counsel of record.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  August 8, 2024

*C. Kailani Memmer*

C. Kailani Memmer
United States Magistrate Judge